813 F.2d 992
 43 Fair Empl.Prac.Cas. 613,
42 Empl. Prac. Dec. P 36,957
William CLEGHORN; George Lane; Erwin Dale Waler; Furl
Porter; Eddy Moore; Harold Maesaka; John
Fletcher; Glen Betts; Carlos Lujan;
Ira Matlock; J. Wakeman,
Plaintiffs-Appellants,
v.
John S. HERRINGTON, Secretary, United States Department of
Energy; Herman E. Roser, Assistant Secretary for Defense
Programs, United States Department of Energy; Ralph E.
Caudle, Director of Safeguards and Security Defense
Programs, United States Department of Energy; Wackenhut
Services, Inc., Defendants-Appellees.
 No. 86-1914.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 1, 1986.
Decided March 27, 1987.
 
 Robert D. Vogel, Los Angeles, Cal., for plaintiffs-appellants.
 Jeffrica J. Jenkins, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before WALLACE, NORRIS and BRUNETTI, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Cleghorn and ten others (Cleghorn) appeal from a summary judgment dismissing their attack on regulations promulgated by the Department of Energy (the Department). The disputed regulations, 10 C.F.R. Secs. 1046.11.13 (1986), establish minimum physical fitness requirements for armed security guards employed at United States nuclear facilities. The district court properly exercised jurisdiction pursuant to 28 U.S.C. Sec. 1331. We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 
 2
 * Congress has charged the Department with regulating the development, use and control of atomic energy. 42 U.S.C. Secs. 2011-2296, 7151. As part of its duties, the Department manages a number of nuclear facilities. One of the Department's primary duties is to ensure the security of these facilities. To this end, the Department contracts with private companies to provide security personnel. Cleghorn works as a security inspector for one of these private firms, Wackenhut Services, Inc., which the Department hired to provide security at nuclear facilities in Nevada.
 
 
 3
 Faced with a growing threat of domestic and international terrorism, the Department perceived a need to strengthen its security capabilities. To ensure that its security force was in adequate physical condition to protect the nuclear facilities it manages, the Department imposed minimum physical fitness standards. Security personnel were divided into two categories: offensive combative personnel, who are those "[s]ecurity inspectors assigned to response force duties including pursuit and assault functions," 10 C.F.R. Sec. 1046.3 (1986); and defensive combative personnel, who are all those security inspectors not assigned offensive combative responsibilities. 10 C.F.R. Sec. 1046.3 (1986). The new standards require security personnel with offensive combative responsibilities to be able to run one mile in under 8 minutes, 30 seconds, and to run 40 yards in under 8 seconds. 10 C.F.R. Sec. 1046 Subpt. B, App. A(F)(1) (1986). Similar but somewhat less taxing standards are imposed on security personnel with defensive combative functions. 10 C.F.R. Sec. 1046 Subpt. B, App. A(F)(2) (1986). Both prospective and current employees are required to meet the standards. 10 C.F.R. Sec. 1046.11(a), (b)(1) (1986).
 
 
 4
 These standards were adopted after a two-year validation study by an independent contractor. The authors of the study, Professional Management Associates, Inc. (the authors), first developed a list of skills and tasks required of all security inspectors at the affected facilities. Security personnel were then tested and graded for both physical fitness and the ability to carry out their required duties. Based on a resulting correlation between physical fitness and job performance, the authors recommended the fitness test described above. Following the notice and comment period required by 5 U.S.C. Sec. 553, during which the Department received and considered numerous comments on the proposed tests, the standards were adopted on November 23, 1984.
 
 
 5
 In 1985, the fitness program was instituted at the facility where Cleghorn is employed. On June 17, 1985, Cleghorn brought suit to enjoin the Department "from implementing or in any way further requiring the Plaintiffs ... to participate in the physical fitness tests." Cleghorn alleged that the regulations violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Secs. 621-634, the fifth and fourteenth amendments, and the Administrative Procedure Act (APA), 5 U.S.C. Secs. 551-559, 701-706. With Cleghorn's consent, the district court dismissed without prejudice the ADEA and other discrimination claims on mootness and ripeness grounds. The district court also granted the Department summary judgment on the ground that the Department was entitled to judgment as a matter of law on the APA claim. Cleghorn appeals, arguing that the Department violated section 706(2)(A) of the APA in its adoption and implementation of 10 C.F.R. Secs. 1046.11-.13 (1986).
 
 II
 
 6
 We review the district court's granting of summary judgment de novo. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). The Department's decision to impose the requirement may be set aside only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A).
 
 
 7
 Cleghorn argues that the physical fitness regulations are "otherwise not in accordance with law" because the underlying validation study did not meet the standards for validation studies under Title VII set forth in the Equal Employment Opportunity Commission's Uniform Guidelines on Employee Selection Procedures. See generally 29 C.F.R. Secs. 1607.1-.18 (1986) (the Uniform Guidelines). The Department's adoption of the regulations, Cleghorn concludes, therefore violated section 706(2)(A) of the APA. This claim raises the question of the scope of application of section 706(2)(A). In essence, Cleghorn is arguing that any violation of a substantive statute or regulation by an agency creates a cause of action under the APA.
 
 
 8
 Cleghorn raised this issue for the first time during oral argument and has not cited any cases or legislative history in support of his novel theory. In his moving papers for summary judgment in the district court and in his brief to this court, Cleghorn relied on the more traditional review standard, writing that review of agency decisions "is limited to 'whether the agency decision was based on relevant factors and whether there has been a clear error of judgment.' "
 
 
 9
 We need not decide in this appeal whether any agency violation of a substantive statute or regulation can be the basis of a claim pursuant to the APA. The question before us is more narrow and deals only with a specific statute.
 
 
 10
 Cleghorn's attempt to use the APA to assert what is in effect a Title VII claim must fail because it would allow him to circumvent, in direct contravention of congressional intent, the numerous procedural and substantive requirements of Title VII. Title VII was enacted by Congress to insure equality in employment opportunities by eliminating practices that arbitrarily discriminated against individuals on the basis of race, color, religion, sex, or national origin. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Towards this end, Congress enacted an administrative framework to settle disputes through "conference, conciliation, and persuasion before the aggrieved party [is] permitted to file a lawsuit." Id. Among other things, this framework includes detailed exhaustion requirements, time limitations, and damage provisions. Allowing a litigant to assert Title VII rights through the less demanding strictures of the APA would frustrate Congress's purpose. See Brown v. GSA, 425 U.S. 820, 833, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976).
 
 
 11
 A similar attempt to circumvent the Title VII procedural requirements was specifically rejected by the Supreme Court in Great American Savings and Loan Association v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). The Court ruled in Novotny that Title VII rights could not be asserted pursuant to 42 U.S.C. Sec. 1985(3), a reconstruction era civil rights statute, because "[u]nimpaired effectiveness can be given to the plan put together by Congress in Title VII only by holding that deprivation of a right created by Title VII cannot be the basis for a cause of action under Sec. 1985(3)." Id. at 378, 99 S.Ct. at 2352. The teachings of Novotny are applicable here. As a Title VII claim cannot be the basis of a section 1985(3) claim, it cannot be the basis of an APA claim.
 
 
 12
 The Department's authority to promulgate and impose physical fitness requirements is not before us. Both sides have conceded that the Department can require minimum levels of fitness as part of its statutory duty to develop, use, and control atomic energy. See 42 U.S.C. Secs. 2012(a), (e), 7151. Cleghorn's sole remaining contention in this appeal is that the Department abused its discretion in imposing the physical fitness test because it relied on a faulty validation study. Our decision, however, cannot be based on a determination of whether the study is correct and proper.
 
 
 13
 Our proper role in this case is simply to determine whether the Department acted arbitrarily or capriciously, or abused its discretion in imposing the physical fitness requirements. 5 U.S.C. Sec. 706(2)(A). The scope of review under the abuse of discretion standard is very narrow. Bowman Transportation, Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974). After determining whether the Department acted within its statutory authority and that required procedures were followed, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). We will uphold the regulation if substantial evidence supports the agency's findings of fact and a rational connection exists between the facts found and the choice made. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).
 
 III
 
 14
 While Cleghorn has alleged 15 separate deficiencies in the validation study, his claims can be divided into 3 basic categories: (1) that the test measures only the ability to respond to and train for emergency situations, not performance in day-to-day job responsibilities; (2) that the sample relied on in developing the test did not accurately reflect the relevant labor market; and (3) that the test was not cross-validated by age or sex.
 
 
 15
 The validation study, by the authors' admission, was not perfect. Such studies, however, are by their nature difficult, expensive, time consuming and rarely, if ever, free of error. See Clady v. County of Los Angeles, 770 F.2d 1421, 1431 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986). In light of the deferential standard we must apply, we conclude that we cannot say that the Department's reliance on the disputed validation study constituted an abuse of discretion.
 
 A.
 
 16
 Cleghorn first attacks the authors' exclusive focus on emergency tasks and training duties instead of routine day-to-day activities in formulating the test requirements. The authors of the study employed the "criterion validation" method to substantiate their results. This method required the authors to identify criteria that indicates successful job performance and then correlate test scores with the identified criteria. Washington v. Davis, 426 U.S. 229, 247 n. 13, 96 S.Ct. 2040, 2051 n. 13, 48 L.Ed.2d 597 (1976). In preparing the study, the authors first traveled to every Department nuclear site in the nation. Routine day-to-day tasks, as well as emergency ones, were reviewed and analyzed at each site. Based on this extensive review, the authors determined that a number of physically demanding "combative" tasks were common to security inspectors at every site. While the authors focused on the emergency tasks in developing the standards, finding them the more physically demanding, routine daily tasks were also examined.
 
 
 17
 While Cleghorn's brief is far from clear, it appears that he objects to this emphasis because it ostensibly results in a physical fitness test that measures skills relating only to training and emergency duties. That is, he does not argue that the Department failed to consider relevant factors, but instead that its decision to test only for emergency duties is irrational.
 
 
 18
 While it is to be hoped that terrorist attacks on our nuclear facilities will never be a routine occurrence, the ability to respond effectively to such attacks is crucial to our security. To this end, security inspectors are trained in offensive and defensive combat skills. The authors found a significant correlation between the inspectors' performance in these training exercises and their physical fitness test scores. Their emphasis on these test scores is thus not unreasonable. To draw an analogy, merely because military servicemen do not spend the bulk of their time in armed combat does not mean that the military cannot require its personnel to have the physical skills necessary to engage in such combat should the situation arise. There was no abuse of discretion in testing the security inspectors for the skills necessary to repel hostile attacks.
 
 B.
 
 19
 Cleghorn's separate but related attacks on the sufficiency of the testing sample suffer a similar fate. The impetus for the first of these contentions comes from an admission by the authors that "[it] must be assumed that the sample employed in this study was more physically fit and highly motivated than the security population as a whole, in addition to being biased in representation by sex." The problem with the sample resulted in part because physically fit personnel were more likely to volunteer and because there was a higher drop-out rate among physically unfit and female test subjects.
 
 
 20
 Cleghorn extrapolates from this admission that the authors had implicitly acknowledged that the study was invalid. We find no such admission. In fact, the authors explicitly stated that "where significant results were obtained," the problems with the sample "did nothing to weaken the validity of relationships."
 
 
 21
 Cleghorn also argues that the testing sample was not chosen from the relevant population because (1) volunteers for the study came from a single nuclear facility and (2) individuals who were not full-time security inspectors were included in the sample. The authors recruited volunteers for the study exclusively from the Sandia National Laboratories in Albuquerque, New Mexico. The authors found the security force at that institution to be "generally representative" of the national security force. In the end, 69 individuals completed the study. This number was considered adequate to achieve statistical significance. Thirty-three participants were full-time security inspectors; the rest were members of the facility's auxiliary guard force. Auxiliary guards have the same basic duties in emergency situations as the regular security force.
 
 
 22
 Given the undisputed similarities between the testing sample and the relevant population, we conclude that Cleghorn's objections to the testing sample are insufficient to demonstrate that relevant factors were not considered or that the Department's decision was irrational.
 
 C.
 
 23
 Cleghorn's final argument, that the test was invalid because it was not cross-validated by age and sex, does not persuade us that the Department abused its discretion in accepting the report and its recommendations. The test was validated for age, the authors having found it to be as valid a predictor of successful job performance for those over the age of forty as for those under. In addition, the authors determined that even though a conclusive cross-validation for gender was impossible, the correlation for gender was in the direction of validity.
 
 IV
 
 24
 The parties' final dispute centers on whether we should consider an affidavit submitted by Cleghorn's expert witness. The affidavit was not part of the administrative record. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). Therefore, we do not consider this affidavit.
 
 
 25
 AFFIRMED.