RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

OAKBROOK LAND HOLDINGS, LLC; WILLIAM DUANE
HORTON, Tax Matters Partner,

　　　　　　　　　　*Petitioners-Appellants*,

　　　*v*.

COMMISSIONER OF INTERNAL REVENUE,

　　　　　　　　　　*Respondent-Appellee*.

┐
│
│
│
│
├ No. 20-2117
│
│
│
│
┘

─────────────────

On Appeal from the United States Tax Court.
No. 005444-13—Mark V. Holmes, Judge.

Argued:  October 27, 2021

Decided and Filed:  March 14, 2022

Before:  GUY, MOORE, and GIBBONS, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  David William Foster, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP,
Washington, D.C., for Appellants.  Nathaniel S. Pollock, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, DC, for Appellee.  **ON BRIEF:**  Michelle Abroms Levin, SIROTE
& PERMUTT, P.C., Huntsville, Alabama, Gregory P. Rhodes, SIROTE & PERMUTT, P.C.,
Birmingham, Alabama, for Appellants.  Nathaniel S. Pollock, Francesca Ugolini, Arthur T.
Catterall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC, for Appellee.
Joseph D. Henchman, NATIONAL TAXPAYERS UNION FOUNDATION, Washington, D.C.,
Kip D. Nelson, FOX ROTHSCHILD LLP, Greensboro, North Carolina, for Amici Curiae.

　　　MOORE, J., delivered the opinion of the court in which GIBBONS, J., joined.  GUY, J.
(pg. 28–41), delivered a separate opinion concurring in the judgment only.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.    Under § 170(h) of the Internal Revenue Code, taxpayers who donate an easement in land to a conservation organization may be eligible to claim a charitable deduction on their Federal income tax returns.  Crucially, the easement's conservation purpose must be guaranteed to extend in perpetuity to qualify for the deduction. *See* 26 U.S.C. (I.R.C.) § 170(h)(5)(A).   Unexpected developments, however, may make this impossible long after the donor has deeded the easement away.  How, then, can an easement satisfy the perpetuity requirement?

Contemplating such scenarios, the Department of Treasury has promulgated a rule, 26 C.F.R. (Treas. Reg.) § 1.170A-14(g)(6).  This regulation addresses situations in which unforeseen changes to the surrounding land make it "impossible or impractical" for an easement to fulfill its conservation purpose.  Treas. Reg. § 1.170A-14(g)(6)(i).   In these events, the conservation purpose may still be protected in perpetuity "if the restrictions are extinguished by judicial proceeding and all of the donee's proceeds . . . from a subsequent sale or exchange of the property are used by the donee" to further the original conservation purpose. *Id*.  Proceeds are calculated by a formula in § 1.170A-14(g)(6)(ii), a provision to which we refer as the "proceeds regulation."

On this appeal from the United States Tax Court, the petitioners, Oakbrook Land Holdings, LLC (Oakbrook) and William Duane Horton, challenge the validity of the proceeds regulation.  The petitioners contend that, in promulgating this rule, Treasury violated the notice-and-comment requirements of the Administrative Procedure Act (APA).  The petitioners also argue that Treasury's interpretation of § 170(h)—the statute that the rule implements—is unreasonable.   Finally, the petitioners argue that the proceeds regulation is arbitrary or capricious.  The full Tax Court considered these arguments and found them to be unpersuasive. *See Oakbrook Land Holdings v. Comm'r*, 154 T.C. 180, 181 (T.C. 2020).  We agree with the Tax Court and **AFFIRM**.

## I.  BACKGROUND

Due to the nature of the issues, we outline the statutory and regulatory framework that governs charitable deductions for conservation easements before describing the rulemaking process of the proceeds regulation.  Once that is established, we turn to the facts of this case.

### A.  Statutory and Regulatory Framework

Section 170(a)(1) of the Internal Revenue Code allows taxpayers to deduct charitable donations made during the tax year.  The Code generally disallows gifts that consist of less than the taxpayer's entire interest in the property—such as an easement—from qualifying for a deduction.  *See* I.R.C. § 170(f)(3)(A); *Glass v. Comm'r*, 471 F.3d 698, 706 (6th Cir. 2006).  There is an exception if the interest is a "qualified conservation contribution."  I.R.C. § 170(f)(3)(B)(iii).  This type of gift may qualify for a deduction if it is "of a qualified real property interest," "to a qualified organization," and is "exclusively for conservation purposes."  I.R.C. § 170(h)(1)(A)–(C).  Easements can qualify as such contributions.  *See Glass*, 471 F.3d at 699–700.

Perpetuity is vital to the statutory scheme.  An easement is a qualified real property interest only if its deed creates "a restriction (granted *in perpetuity*) on the use which may be made of the real property."  I.R.C. § 170(h)(2)(C) (emphasis added).  Driving home how important the parenthetical phrase in § 170(h)(2)(C) is, a nearby provision explains that a contribution will not be treated as having been made exclusively for conservation purposes "unless the conservation purpose is protected *in perpetuity*."  I.R.C. § 170(h)(5)(A) (emphasis added).  In other words, the donation of an easement will not qualify for a charitable deduction unless the taxpayer can guarantee that both the grant of the interest and the conservation goals which it serves will endure for quite a long time—forever, to be exact.  *See Hoffman Props. II, LP v. Comm'r*, 956 F.3d 832, 835 (6th Cir. 2020).

Although I.R.C. § 170(h)(5)(A) expressly mandates that a donated easement's conservation purpose must be protected in perpetuity, the section does not detail what should happen if some external event frustrates this purpose, such as when unforeseen changes in the surrounding land undermine the easement's conservation goals or when a government entity

condemns the property.  *See generally* Nancy A. McLaughlin, *Conservation Easements and the Proceeds Regulation*, 56 REAL PROP. TR. & EST. L. J. 111, 122, 150–52 (2021) (discussing ways in which easements' conservation purposes can be thwarted).  For guidance in these scenarios, taxpayers must turn from the text of I.R.C. § 170(h)(5)(A) to the administrative regulation implementing it.

Treasury Regulation § 1.170A-14(g)(6) governs in the event of an "extinguishment." When a "subsequent unexpected change in the conditions surrounding the property . . . . make[s] impossible or impractical the continued use of the property for conservation purposes," the perpetuity requirement of I.R.C. § 170(h)(5)(A) can still be satisfied if two conditions are met. First, the restriction is "extinguished by judicial proceeding."  Treas. Reg. § 1.170A-14(g)(6)(i). Second, "all of the donee's proceeds (determined under paragraph (g)(6)(ii) of this section) from a subsequent sale or exchange of the property are used by the donee organization in a manner consistent with the conservation purposes of the original contribution."  *Id.*

Upon extinguishment, a donee organization must receive as proceeds "a fair market value that is at least equal to the *proportionate value* that the perpetual conservation restriction at the time of the gift[] bears to the value of the property as a whole at that time."  Treas. Reg. § 1.170A-14(g)(6)(ii) (emphasis added).  To determine the "proportionate value" of an easement, the fair market "value of the conservation easement at the time of the gift [must be] divided by the value of the property as a whole at that time."  *PBBM-Rose Hill, Ltd. v. Comm'r*, 900 F.3d 193, 207 (5th Cir. 2018).  For example, if, at the time of the donation, the fair market value of an easement was $25,000 and the value of the land was $100,000, then the easement would be assessed at twenty-five percent of the value of the property.  Next, if a judicial extinguishment occurs, the donee must receive proceeds equal to the proportionate value from any "subsequent sale, exchange, or involuntary conversion."  Treas. Reg. § 1.170A-14(g)(6)(ii).  The donee in the previous example would therefore receive twenty-five percent of any proceeds of a sale, exchange, or involuntary conversion that followed judicial extinguishment of the easement.

Finally, no "amount, including that attributable to improvements, may be subtracted out" of this percentage.[1]  *PBBM-Rose Hill, Ltd.*, 900 F.3d at 208.

Although the possibility of an easement being judicially extinguished is a contingency, taxpayers still need to address this issue in the easement's deed.  The deed must entitle the donee "to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction" should a judicial extinguishment occur.[2]  Treas. Reg. § 1.170A-14(g)(6)(ii).  Failure to draft a deed that achieves this goal will leave the taxpayer unable to claim a charitable deduction for their donation.  Treas. Reg. § 1.170A-14(g)(1).

## B.  Promulgation of Treas. Reg. § 1.170A-14(g)(6)(ii)

On May 23, 1983, Treasury issued a notice of proposed rulemaking with "proposed regulations relating to contributions of partial interests in property for conservation purposes." 48 Fed. Reg. 22940, 22940 (May 23, 1983).  In that notice, Treasury detailed the legislative history of § 170(h), describing how Congress had shifted from limiting the deductibility of conservation easements to allowing them when the easement was "perpetual."  *Id.*  The preamble noted that the proposed regulations "reflect the major policy decisions made by the Congress and expressed in [its] committee reports."  *Id.*  Among the proposed rules was the proceeds regulation.

A period of public input followed Treasury's publication of the notice of proposed rulemaking in which the agency received comments regarding the regulations.  Ninety organizations submitted over 700 pages of commentary that addressed various aspects of the regulations.  *Oakbrook Land Holdings*, 154 T.C. at 186.  Of these commentators, approximately a dozen mentioned the proceeds regulation, though mostly in passing.  *Id.*  We detail several of these comments further below.  Treasury also held a public hearing on the proposed regulations on September 15, 1983.  *Id.* at 188.

---

[1]The parties do not appear to dispute how proceeds are calculated under the regulation.

[2]Treasury Regulation § 1.170A-14(g)(6)(ii) also contains an exception for when "state law provides that the donor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction," but the current case does not implicate this provision.

When Treasury issued the final regulations, the accompanying preamble stated that the agency had promulgated the regulations "[a]fter consideration of all comments regarding the proposed amendments." 51 Fed. Reg. 1496, 1496 (Jan. 14, 1986). Some comments that Treasury received during the rulemaking process did cause the agency to alter parts of the regulations, leading the agency to summarize these comments and the changes that they prompted. *Id*. at 1497–98. Treasury also revised the proceeds regulation, but these changes were editorial in nature and aimed at clarifying the rule, not altering its meaning.[3] Treasury did not specifically address any comments that it received about the proceeds regulation.

## C. Oakbrook's Easement

Oakbrook is a Tennessee Limited Liability Company with its principal place of business in Chattanooga. Joint Appendix (J.A.) at 98–99 (Stipulation of Facts at ¶ 1). William Duane Horton and a group of investors formed the company to purchase and develop a 143-acre parcel of land on White Oak Mountain, an outcropping of the Appalachians near Chattanooga. *Id*. at 1179–80 (Tax Ct. Mem. Op. at 3–4). In 2007, Oakbrook bought the land for $1,700,000. *Id*. at 1180 (Tax Ct. Mem. Op. at 4).

Originally Horton and his wife found the property in their search for a place to build a home. *Id*. at 1179 (Tax Ct. Mem. Op. at 3). The property's proximity to Chattanooga led Horton to believe that residential units could be developed there, and this is what Oakbrook set about to achieve after purchasing the land. *Id*. at 1180 (Tax Ct. Mem. Op. at 4). After learning about conservation easements, Horton convinced his fellow investors in 2008 to have Oakbrook donate a conservation easement on 106 acres of the land to the Southeast Regional Land Conservancy (SRLC), reserving the remaining acreage for development. *Id*. at 1181 (Tax Ct. Mem. Op. at 5).

The deed that conveyed the easement provided for allocation of proceeds upon extinguishment or condemnation, and the parties do not dispute how this calculation works. *Id*. at 121–22 (Deed at Article VI, § B(2)–(3)). Under the deed, the fair market value of the

---

[3]Instead of providing that the donor agree at the time of the gift that the donee receive on a subsequent sale, exchange, or involuntary conversion of the property "a minimum ascertainable proportion of the fair market value to the entire property," 48 Fed. Reg. at 22946, the final rule ensured that the donee receive "a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift[] bears to the value of the property as a whole at that time." 51 Fed. Reg. at 1505.

easement is determined by calculating the fair market value of the land *without* the encumbrance of the easement, and then subtracting from this number the fair market value of the land *with* the easement. *Id*. at 121 (Deed at Art. VI, § B(2)). The fair market value of each is determined at the time of the gift, creating a fixed value. *Id.* The deed then requires one more subtraction: the fixed value of the easement must be reduced by the value of any post-donation improvements made by Oakbrook to the land as specified by any subsequent condemnation award. *Id*. at 121–22 (Deed at Art. VI, § B(2)).

While negotiating these terms, Oakbrook arranged for an appraisal of the conservation easement to determine the amount to claim as a charitable deduction. *Id*. at 1184 (Tax Ct. Mem. Op. at 8). Initially, the appraiser valued the easement at $19,500,000, but Horton expressed unease about setting the value so high, likely because Oakbrook had bought all 143 acres the year before for $1,700,000. *Id*. The appraiser then reassessed the easement at $9,545,000. *Id*. Oakbrook claimed this amount as a charitable deduction for the 2008 tax year. *Id*. at 1184–85 (Tax Ct. Mem. Op. at 8–9).

## D.  Procedural History

After Oakbrook filed its 2008 tax return, the Internal Revenue Service (IRS) examined the claimed charitable contribution deduction. *Id*. at 1185 (Tax Ct. Mem. Op. at 9). Because the easement's deed did not comply with Treas. Reg. § 1.170A-14(g)(6)(ii), the IRS disallowed Oakbrook's deduction in full. *Id*. at 17–29, 213–22 (Disallowances). Oakbrook timely petitioned the Tax Court for a readjustment. *Id*. at 8–16 (Pet. for Readjustment). Tax Court Judge Holmes held a bench trial in October 2016 to resolve the matter. *Id*. at 4 (Tax Ct. Dkt. at 4).

In the Tax Court, the petitioners argued both that the easement deed satisfied Treas. Reg. § 1.170A-14(g)(6)(ii) and, alternatively, that the regulation was invalid. *Id*. at 1179 (Tax Ct. Mem. Op. at 3). The full Tax Court heard argument concerning the validity of Treas. Reg. § 1.170A-14(g)(6)(ii), *see Oakbrook Land Holdings*, 154 T.C. at 180–81, while Judge Holmes heard arguments about whether Oakbrook's deed violated the regulation, J.A. at 1179 (Tax Ct. Mem. Op. at 3). The full Tax Court upheld the regulation. *See Oakbrook Land Holdings*,

154 T.C. at 180–81, 198–200, 230.  At the same time, Judge Holmes held that Oakbrook's deed violated the proceeds regulation in two ways:  first by ascribing a fixed rather than proportionate value that would go to SRLC upon judicial extinguishment, and second by subtracting from this amount any post-donation improvements that Oakbrook made to the land.  J.A. at 1212–17 (Tax Ct. Mem. Op. at 36–41).

The petitioners timely appealed.  *Id*. at 1226–27 (Notice of Appeal).  *See* 26 U.S.C. § 7483.  We have jurisdiction over the case under 26 U.S.C. § 7482(a).

## II.  ANALYSIS

On appeal, the petitioners take aim directly at the proceeds regulation, arguing that the Tax Court erred in upholding the regulation.  We review the Tax Court's findings of fact for clear error and its application of law de novo.  *Glass*, 471 F.3d at 706.  Our "function in reviewing final agency action following informal rulemaking [such as Treasury's promulgation of the proceeds regulation] is prescribed by the APA."  *Simms v. Nat'l Highway Traffic Safety Admin*., 45 F.3d 999, 1003 (6th Cir. 1995).  Under § 706(2)(A) of the APA, we must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### A.  Enforceability of Oakbrook's Deed Under I.R.C. § 170(h)

Before addressing the proceeds regulation's validity, we must address a preliminary matter.  To count as a qualified real property interest under I.R.C. § 170(h)(1)(A), the Commissioner argues that a conservation easement's deed must guarantee that the donee will receive the fair market value of the interest upon judicial extinguishment.  Pointing to the provisions in the deed that fix the easement's value at the time of the gift and then subtract the worth of post-donation improvements, the Commissioner concludes that Oakbrook's deed would fail to compensate SRLC at fair market value should the easement be extinguished.  Under this reading of I.R.C. § 170(h)(1)(A), the Commissioner argues, we need not determine whether Treas. Reg. § 1.170A-14(g)(6)(ii) is a valid regulation because Oakbrook's deed violates the statute.

Regardless of whether this interpretation of I.R.C. § 170(h)(1)(A) is correct, the Commissioner introduces it for the first time on appeal. The only issue that the Commissioner raised below about Oakbrook's deed satisfying § 170(h) was the argument in his pretrial memorandum that the deed inadequately defined the physical area intended for conservation purposes, leaving it impossible to determine what was being conserved and what was not. J.A. at 40, 47–49 (Resp't Pretrial Mem. at 3, 10–12). Nowhere did the Commissioner argue that the deed would fail to compensate SRLC at fair market value should the easement be extinguished. Instead, Judge Toro's concurrence in the Tax Court's opinion raised this issue *sua sponte* with neither the majority nor the dissent addressing it. *Oakbrook Land Holdings*, 154 T.C. at 203–07.

"[A]ppellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance." *Wood v. Milyard*, 566 U.S. 463, 473 (2012). This case demonstrates the wisdom of this approach. For Oakbrook's deed to violate the Commissioner's interpretation of the statute, it must fail to provide whatever the fair market value of the easement will be upon extinguishment. But this conclusion relies on an assessment of the projected economic worth of the property interest, which is not in the record.[4] Should the fair market value of the interest have increased by the time of extinguishment, then the Commissioner will be proven right. Should the value decline, then the Commissioner will be proven wrong. Either way, future events, not statutory text, hold the answer. *Cf. United States v. Ellison*, 462 F.3d 557, 560–61 (6th Cir. 2006) (addressing argument not raised below where issue turned on pure question of law). For this reason, we decline to address the Commissioner's newly raised argument.

---

[4]Instead of citing to the record, the Commissioner cites to data pulled from Zillow.com and Neighborhoodscout.com to support the proposition that under the terms of the deed, judicial extinguishment "20, 50, or 100 years from now" would lead to SRLC receiving less than the easement's fair market value. Resp't Br. at 36. Likewise, the Commissioner asserts, without any citations, that the value of fixed structures that Oakbrook may add to the property will likely increase over time, which, because of the mechanism in the deed that allows Oakbrook to recoup this value, would further cut into the amount SRLC would receive in the event of judicial extinguishment. *Id.* at 38. Although the concurrence appears confident in these assessments, we are hesitant to rely on economic projections that have not been vetted by the adversarial process, provide no supporting evidence, and are based on commercial real estate websites.

**B. Procedural Issues with Treas. Reg. § 1.170A-14(g)(6)(ii)**

This leaves us to examine the validity of Treas. Reg. § 1.170A-14(g)(6)(ii). Under the APA, whenever agencies promulgate "a rule that 'intends to create new law, rights or duties'" such as this regulation does, they must engage in a process known as notice-and-comment rulemaking. *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (quoting *Michigan v. Thomas*, 805 F.2d 176, 182–83 (6th Cir. 1986)). *See also* 5 U.S.C. § 553(b). There are three steps involved in this process. First, the agency must publish a "notice of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b). Next, the agency must afford "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c). Finally, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id*.

The petitioners contend that the agency deviated from the APA's notice and comment requirements in two ways. First, the petitioners argue that Treasury inadequately explained the rationale for the proceeds regulation in its concise general statement of basis and purpose. Second, the petitioners argue that the agency failed to respond to certain comments about the regulation, which, according to the petitioners, raised significant issues. We consider each argument in turn.

**1. Adequacy of Treasury's Concise Statement of Basis and Purpose**

After the comment period closed, Treasury issued a concise statement of basis and purpose for Treas. Reg. § 1.170A-14 that explained the regulations' goals and addressed various comments made about the rules. *See* 51 Fed. Reg. at 1497–98. This statement lacked an explanation for the policy rationale behind Treas. Reg. § 1.170A-14(g)(6)(ii) specifically. Instead, Treasury explained that the regulations contained in Treas. Reg. § 1.170A-14 "provide necessary guidance to the public for compliance with the law and affect donors and donees of qualified conservation contributions." 51 Fed. Reg. at 1496. To the petitioners, this explanation is far too succinct to provide adequate insight into the proceeds regulation's rationale. Placing this explanation within the context of the rulemaking leads us to the opposite conclusion.

What an agency must include in a concise general statement of basis and purpose is dictated by competing considerations. Courts, on the one hand, must be able "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." *Simms*, 45 F.3d at 1005 (quoting *Auto. Parts & Accessories Ass'n, Inc. v Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)). Judicial scrutiny does not "contemplate that the court itself will, by a laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution." *Auto. Parts & Accessories Ass'n, Inc.*, 407 F.2d at 338. Agencies, on the other hand, operate with scarce time and limited resources. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, Inc.*, 435 U.S. 519, 551 (1978). These limitations mean that an agency cannot "discuss every item of fact or opinion included in the submissions made to it in informal rule making." *Simms*, 45 F.3d at 1005 (quoting *Auto. Parts & Accessories Ass'n, Inc.*, 407 F.2d at 338).

Balancing these considerations, the APA's concise-general-statement requirement "is not meant to be particularly onerous." *Nat'l Mining Ass'n v. Mine Safety & Health Admin.* 512 F.3d 696, 700 (D.C. Cir. 2008). Absent an ideal statement, courts may still conduct judicial review and uphold a regulation "where the basis and purpose [are] considered obvious." *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 443 (9th Cir. 1993); *see also Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 303 (2d Cir. 2006); *Citizens to Save Spencer Cnty. v. U.S. EPA*, 600 F.2d 844, 884 (D.C. Cir. 1979). If a statement is truly concise, then "[a] careful reading of the agency's published notices, from its original grant of the petition for rulemaking to its final rule, [may still] disclose[] a 'reasoned path'" that the agency followed to reach its ultimate rule. *Simms*, 45 F.3d at 1006 (quoting *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 639 (D.C. Cir. 1984)).

Juxtaposing the final version of Treas. Reg. § 1.170A-14(g)(6)(ii) with the notice of proposed rulemaking reveals that the basis and purpose of the rule are apparent. In the background section of the proposed version of the proceeds regulation, Treasury provided a brief history of how the Code had treated the charitable deductions of conservation easements. 48 Fed. Reg. at 22940. This history traced how contributions of partial interests went from being disfavored under the Tax Reform Act of 1969, to being allowed under the Tax Reduction and

Simplification Act of 1977. *Id.* This allowance came with a caveat: conservation easements had to "be perpetual in order to qualify for a deduction under section 170." *Id.* After Congress again amended the Code with the Tax Treatment Extension Act of 1980, Treasury proposed the proceeds regulation to implement I.R.C. § 170(h). 48 Fed. Reg. at 22940. Notably, although I.R.C. § 170(h)(5)(A) required that easements' conservation purposes be protected in perpetuity, the provision was silent about how to guarantee this requirement in the event of extinguishment. Facing this lacuna, it was obvious that Treasury would need to craft a regulation that spoke to the issue of protecting an easement's conservation purpose should unforeseen circumstances stymie this end.[5]

As it contemplated promulgating the regulations of which Treas. Reg. § 1.170A-14(g)(6)(ii) was a part, Treasury noted its animating concerns. Foremost among these was the "problem" of "how to provide a workable framework for donors, donees, and the Internal Revenue Service to judge the deductibility of open space easements." 48 Fed. Reg. at 22940. Treasury's explicit reliance on the committee reports that accompanied the 1980 reforms to the Code make clear the contours of this problem. *See id.* (detailing how the proposed regulations "reflect the major policy decisions . . . expressed" in H.R. REP. NO. 96-1278 (1980) and S. REP. NO. 96-1007 (1980)).

Both the House Ways and Means Committee and the Senate Finance Committee noted that conservation easements threatened to incentivize "tax-avoidance transactions in which the taxpayer could obtain a deduction for a gift to a charity of the use of part of his property." H.R. REP. NO. 96-1278, at 14; S. REP. NO. 96-1007, at 8. To avoid such abuse, the committees emphasized that the "bill would restrict the qualifying contributions where there is no assurance that the public benefit, if any, furthered by the contribution would be substantial enough to justify the allowance of a deduction." H.R. REP. NO. 96-1278, at 15; S. REP. NO. 96-1007, at 10. Key among these restrictions was the addition of a requirement not previously in the Code: that an easement's conservation purpose be protected in perpetuity to qualify for a charitable

---

[5]Although Congress was aware that extinguishment could pose difficulties for ensuring that a conservation easement's purpose was protected in perpetuity, a coalition of land trusts convinced it to leave the creation of rules to govern these circumstances to Treasury. *See* McLaughlin, *supra*, at 122–23 (detailing legislative history).

deduction. *See* H.R. REP. NO. 96-1278, at 18 ("Moreover, the bill explicitly provides that [the] requirement [that a contribution is made exclusively for conservation purposes] is not satisfied unless the conservation purpose is protected in perpetuity."); S. REP. NO. 96-1007, at 13 (same). An easement's deed needed to "prevent uses of the retained interest inconsistent with the conservation purposes" for an eternity. H.R. REP. NO. 96-1278, at 18; S. REP. NO. 96-1007, at 13.

Along with stressing the need for restrictions in the deed to ensure that an easement served its conservation purpose in perpetuity, the congressional committees were concerned about how the burdens and benefits associated with fulfilling this requirement might be allotted. For instance, when the Senate Committee on Finance reported the bill out of committee, it noted that the perpetuity requirement of I.R.C. § 170(h)(5)(A) aimed "to limit the deduction only to those cases where the conservation purposes will in practice be carried out." S. REP. NO. 96-1007, at 14. With this goal in mind, the Committee noted that contributions must "be made to organizations which have the commitment and the resources to enforce the perpetual restrictions and to protect the conservation purposes." *Id*. Yet whereas the Committee was concerned about the welfare of the donee, it sought to bar the donor from receiving any benefit from the donation above and beyond the deduction. *See id*. at 15 ("[T]here may be instances in which the grant of an easement may serve to enhance, rather than reduce, the value of property, and in such instances no deduction would be allowable . . . ."). Solely in circumstances where these high bars could be cleared would an easement qualify for a charitable deduction under § 170(h). *See id*. at 14, 15; *see also* H.R. REP. NO. 96-1278, at 19, 20 (same discussion).

Taken together, then, the statutory text and the legislative history that Treasury contemplated in promulgating Treas. Reg. § 1.170A-14(g)(6)(ii) illuminate the regulation's basis and purpose: to provide an administrable mechanism that would ensure that an easement's conservation purpose as per I.R.C. § 170(h)(5)(A) continued to be protected should the interest be extinguished. That the regulation allots proceeds in a manner more favorable to donees than to donors merely demonstrates Treasury's acute awareness of Congress's decision to concern itself with the welfare of one entity over the other once the donation was made. Because we can

discern this from the information that Treasury provided during the rulemaking, its concise statement suffices.[6]

## 2. Failure to Respond to Comments

In the concise general statement of basis and purpose that accompanied the final rule, Treasury also did not address any comments that touched on Treas. Reg. § 1.170A-14(g)(6)(ii). For the petitioners, this oversight is the main procedural deficiency with the rule. To this end, they list a series of comments that mentioned the proceeds regulation, argue that at least some of these required Treasury's attention, and conclude that the agency's failure to do so is fatal to the regulations. Having thoroughly examined these comments, we disagree.

The APA's requirement of soliciting comments serves several ends. "In addition to increasing the quality of rules, the required public participation helps 'ensure fair treatment for persons to be affected by' regulation." *United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009) (quoting *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 678 (6th Cir. 2005)). From these principles follows an agency's duty to respond to "significant points raised by the public." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)). After all, if an agency could ignore every comment regardless of its content, then the process of soliciting public input would be pointless. *See id.*

Yet the inverse is true, too. Requiring an agency to respond to every comment regardless of its content would transform rulemaking into

> a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

---

[6]Unlike *Dominion Resources, Inc. v. United States*, on which the concurrence relies to reach the opposite conclusion, the proceeds regulation does not "directly contradict[]" Congress's intent, as is clear from the legislative history that Treasury provided in its notice of proposed rulemaking. 681 F.3d 1313, 1317 (Fed. Cir. 2012). The fact that Treasury provided citations to the congressional reports that informed its thinking provides another contrast to the agency's actions in *Dominion*, where Treasury provided no indication of its rationale for the proposed rule. *Id.* at 1319. These citations allow us to discern what the Federal Circuit could not: the "reasoned path" that Treasury followed in arriving at the regulation. *Simms*, 45 F.3d at 1006 (quoting *Neighborhood TV*, 742 F.2d at 639).

*Vermont Yankee*, 435 U.S. at 553–54. Recognizing that notice-and-comment rulemaking is not an administrative sport, we have repeatedly concluded that an agency must "give reasoned responses to all *significant* comments in a rulemaking proceeding," not that an agency must respond to *all* comments. *United States v. Utesch*, 596 F.3d 302, 310 (6th Cir. 2010) (quoting *PPG Indus., Inc. v. Castle*, 630 F.2d 462, 466 (6th Cir. 1980)) (emphasis added); *see also Navistar Int'l Transp. Corp. v. U.S. EPA*, 941 F.2d 1339, 1359 (6th Cir. 1991).

Significance is difficult to measure in the abstract. The petitioners catalog cases that they argue use different "tests" for determining whether a comment requires an agency's response. *See, e.g.*, *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 852 (D.C. Cir. 1987); *Home Box Office, Inc.*, 567 F.2d at 35 n.58; *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 253 (2d Cir. 1977). Rather than provide discrete tests, however, these cases demonstrate that assessing significance is context dependent and requires reading the comment in light of both the rulemaking of which it was part and the statutory ends that the proposed rule is meant to serve.

"Accordingly, an agency must respond to comments 'that can be thought to challenge a fundamental premise' underlying the proposed agency decision." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)). A comment must provide enough facts and reasoning to show the agency what the issue is and how it is relevant to the agency's aims. *See Vermont Yankee*, 435 U.S. at 553; *Home Box Office, Inc.*, 567 F.2d at 35 n.58. Comments that do so are "significant enough to step over a threshold requirement of materiality" needed for an agency to address them. *Vermont Yankee*, 435 U.S. at 553 (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973)).

To make this concrete, consider one of the cases upon which petitioners rely. In *United States v. Nova Scotia Food Products Corp.*, the Second Circuit considered a rule issued by the Food and Drug Administration (FDA) to address a spate of botulism cases within the inland fish market and ensure that fish could be safely consumed. 568 F.2d at 243. While promulgating the rule, which required all fish to be cooked or brined according to its specifications, the FDA ignored a comment by Nova Scotia Food Products Corp., a company that sold smoked whitefish.

*Id.* at 245. Nova Scotia had recommended that the agency adopt a rule tailored to the heat tolerance of each species so that their product would not be "completely destroy[ed]," due to whitefish being unable to withstand the rigors of the proposed rule. *Id.* The Second Circuit held that the FDA's failure to respond to Nova Scotia's and similar comments rendered the rule arbitrary or capricious. *Id*. at 253. It was unclear how making a fish product inedible would further the FDA's goal of rendering fish safe for human consumption. *Id*.

After examining the comments that petitioners have identified, we hold that none required Treasury's response as Nova Scotia's did the FDA's. Of the comments to which Treasury did not respond, the petitioners focus their attention on four: those made by the New York Landmarks Conservancy, the Landmarks Preservation Council of Illinois, the Land Trust Exchange, and the Trust for Public Land. Situating these comments in the context of the problem that Treasury sought to solve—providing a method for I.R.C. § 170(h)(5)(A)'s perpetuity requirement to be met upon judicial extinguishment—shows why they do not qualify as significant.

The New York Landmarks Conservancy's comment noted three issues with the proceeds regulation: that, based on undisclosed anecdotal evidence, the rule would deter donors from donating easements; that providing the donee with the value of post-donation improvements made by the donor was inequitable; and that it was "possible" that the regulation's allocation of proceeds would conflict with some states' condemnation laws, though the organization did not identify the laws or states. J.A. at 671–72 (N.Y. Landmarks Conservancy Cmt. at 3–4). Although these remarks registered the New York Landmarks Conservancy's dissatisfactions with the proceeds regulation, the comment did not engage with I.R.C. § 170(h)(5)(A)'s perpetuity requirement and whether the rule served this end. Instead, it left Treasury to guess at the connection, if any, between the organization's problems and the proceeds regulation's basis and purpose. Treasury was not required to respond to the comment.

Next, the Landmarks Preservation Council of Illinois commented that how Treas. Reg. § 1.170A-14(g)(6)(ii) calculated proceeds would put a donor at risk of having to pay the donee additional funds if a condemnation award did not cover the amount of money calculated by the rule. J.A. at 778 (Landmarks Pres. Council of Ill. Cmt. at 5). The organization's concern,

however, was not only "purely speculative." *Home Box Office, Inc.*, 567 F.2d at 35 n.58. It was also wrong. Because Treas. Reg. § 1.170A-14(g)(6)(ii) calculates proceeds by using a formula based on the proportionate value, not the fixed value, of the easement, the donor could never owe to the donee more than what the extinguishment proceeds are. So, if an easement was worth fifty percent of the value of the donor's entire property at the time of the grant, then the donee would be entitled to fifty percent of any extinguishment proceeds, whatever the amount of those proceeds is. Given that the comment did not raise a significant issue, Treasury was not obliged to respond it.

Both the Land Trust Exchange and the Trust for Public Land suggested that Treasury adopt the remote future event rule in lieu of the proceeds regulation. J.A. at 685 (Land Tr. Exchange Cmt. at 7); *id.* at 795 (Tr. for Pub. Land Cmt. at 7). The organizations' proposals refer to the provision of the regulations that bears the same name, Treas. Reg. § 1.170A-14(g)(3). The remote future event rule provides a "narrow exception to the perpetuity requirement" of I.R.C. § 170(h)(5)(A), *Hoffman Props.*, 956 F.3d at 837, allowing deductions when the conservation purpose of an easement may be defeated by an "act or event" whose occurrence is "so remote as to be negligible." Treas. Reg. § 1.170A-14(g)(3). Neither organization provided any indication of how expanding this rule—which permits deductions in the face of uncertainty—would fulfill Congress's express aim in I.R.C. § 170(h)(5)(A) of limiting deductions to those instances where an easement's conservation purpose can be safeguarded forever. Because Treasury could not ignore this goal, the agency was not required to respond to comments that would have led it to do so.

The Land Trust Exchange asserted that the tax benefit rule rendered the proceeds regulation unnecessary as well. J.A. at 685 (Land Tr. Exchange Cmt. at 7). Again, how so is unclear from the comment. The tax benefit rule allows a taxpayer to exclude "income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter." I.R.C. § 111(a). This rule—which benefits the donor—bears no relation to the requirement under I.R.C. § 170(h)(5)(A) that an easement's conservation purpose be protected in perpetuity. Nor

did the Land Trust Exchange Treasury provide an explanation that would have made it necessary for Treasury to consider the tax benefit rule in this context.

Finally, the other comments that the petitioners reference in passing did not raise significant concerns. Pet'r Br. at 33. Most comments provided only cursory commentary on Treas. Reg. § 1.170A-14(g)(6)(ii), often with either no discussion of the facts on which they were basing their criticisms, or only vague indications of the sources of these facts. *See Home Box Office, Inc.*, 567 F.2d at 35 n.58. Comments that provided alternatives to the proceeds regulation failed to discuss how these alternatives would satisfy I.R.C. § 170(h)(5)(A). *See* J.A. at 721 (Brandywine Conservancy Cmt. at 3); *id*. at 723 (Wash. Tr. for Hist. Pres. Cmt. at 1); *id*. at 801 (Ginsberg Cmt. at 5). Indeed, no comment that addressed the regulation raised a concern about it failing to satisfy that provision's perpetuity requirement. The APA thus did not require that Treasury provide a response to these comments either.

The petitioners' attempt to reach a different conclusion based on the facts of two of our cases—*Simms v. National Highway Traffic Safety Administration* and *PPG Industries, Inc. v. Costle*—falls short. *Simms* provides little guidance here. In that case, the National Highway Traffic Safety Administration (NHTSA) of the Department of Transportation promulgated a rule regarding how wheelchairs were to be secured on school buses based on "static" rather than "dynamic" testing of securements. 45 F.3d at 1005. Addressing challenges on the adequacy of NHTSA's response to comments that advocated for dynamic testing, we upheld the rule, pointing to the fact that, although NHTSA acknowledged in its concise general statement that "dynamic testing was the preferred approach among commentators," the agency had also "explained the benefits of using static testing and discussed its rationale for rejecting dynamic testing." *Id*. Besides the fact that in the present case there was no well-developed, "preferred approach" among the commentators that Treasury ignored, *Simms* illustrates only what an adequate response to significant comments looks like. But such comments were not before Treasury here.

*PPG Industries* is unhelpful as well. In that case, the Environmental Protection Agency (EPA) designated Summit County, Ohio as needing to take special air pollution abatement measures. *PPG Industries*, 630 F.2d at 464. The EPA had previously relied on faulty computer

modelling in making its designation. *Id.* at 465. When the plaintiffs challenged the new designation, the EPA responded that it had "reanalyzed" the previously faulty data that it computed. *Id.* at 466. The EPA, however, was unable to point to anywhere in the administrative record to support this reanalysis. *Id.* We remanded to the agency so that an administrative record could be developed. *Id.* at 468. Although the petitioners in the present case rely on the fact that we criticized "EPA's perfunctory treatment" of comments that made it "impossible to determine whether the agency's Summit County designation was arbitrary [or] capricious," this misses the forest for the trees. *Id.* at 466. Unlike in *PPG Industries, Inc.*, there is no indication here that Treasury relied on faulty or impermissible premises in promulgating the proceeds regulation.

The petitioners also direct us to a recent decision by the Eleventh Circuit that held the proceeds regulation to be procedurally invalid under the APA. *See Hewitt v. Comm'r*, 21 F.4th 1336, 1339 (11th Cir. 2021). Unlike the concurrence, we find that decision's reasoning to be unpersuasive. In concluding that the New York Landmarks Conservancy's comment raised significant concerns about possible deterrent effects that the proceeds regulation could have on donations, the Eleventh Circuit stressed that one of I.R.C. § 170's aims is "to allow deductions for the donation of conservation easements to encourage donation for such easements." *Id*. at 1352. Although encouraging the donation of conservation easements is undeniably a goal of the statute, highlighting this point overlooks a crucial condition that Congress demanded be met by donors seeking deductions: an easement's conservation purpose must be "protected in perpetuity."[7] I.R.C. § 170(h)(5)(A).

That the proceeds regulation interprets I.R.C. § 170(h)(5)(A) and is meant to enforce Congress's goal of limiting deductions to those instances in which the perpetuity requirement can be satisfied is evident from the regulations. Not only does the plain language of the proceeds regulation address this end, *see* Treas. Reg. § 1.170A-14(g)(6)(i) ("the conservation purpose can nonetheless be treated as protected in perpetuity" if the proceeds regulation is followed upon judicial extinguishment), but the rule is also part of a section in the regulations titled

---

[7]As noted *supra*, the committee reports emphasized this restriction, too. *See* H.R. REP. NO. 96-1278, at 18; S. REP. NO. 96-1007, at 13.

"Enforceable in perpetuity," Treas. Reg. § 1.170A-14(g), that contemplates various scenarios in which the perpetuity requirement of I.R.C. § 170(h)(5)(A) would not be met, *see, e.g.*, Treas. Reg. § 1.170A-14(g)(2), *id.* § 1.170A-14(g)(4). Other than missing § 1.170A-14(g)(2), which regulates how mortgages impact the perpetuity requirement and was added in response to other comments, the proposed rule contained the same relevant language. *See* 48 Fed. Reg. at 22945–47. Put differently, I.R.C. § 170(h)(5)(A) embodies a particular policy that restricts deductions to where an easement's conservation purpose can be protected forever, and Treas. Reg. § 1.170A-14(g)(6)(ii) interprets how to implement that policy. The Eleventh Circuit's decision thus does not alter our conclusion that Oakbrook has failed to cite comments that raised valid concerns about how the regulation served this policy.

At this point, the concurrence interjects to accuse us of treating the perpetuity requirement of I.R.C. § 170(h)(5)(A) as a trump card. But we did not decide that perpetuity should play a vital role in the statutory scheme. Congress did. Even aside from the legislative history on which Treasury expressly relied in crafting the proceeds regulation, the statute's text makes it apparent that what Congress sought to encourage is not simply the donation of conservation easements as the concurrence believes. Rather, Congress intended to incentivize the donations of only those easements that met a highly circumscribed set of prerequisites. These easements must be "of a qualified real property interest," which includes the requirement that the interest contain a perpetual restriction on its use. I.R.C. § 170(h)(1)(A), (2)(C). Donations must be "to a qualified organization." I.R.C. § 170(h)(1)(B). And, of course, they must be "exclusively for conservation purposes"—purposes that must be ensured to endure forever. I.R.C. § 170(h)(1)(C), (5)(A). *Cf. Carlson*, 938 F.3d at 342, 345–46 (noting that "simplicity of structure" was one of the "fourteen [statutory] factors" that Congress explicitly deemed it necessary for the Postal Service to contemplate in rulemaking).

Congress has long understood that any deductions it crafts are to be "strictly construed." *Indopco, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (citing *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); *Deputy v. Du Pont*, 308 U.S. 488, 493 (1940)). If there ever was an instance in which this canon of statutory interpretation lined up with congressional intent, it is one in which Congress created a deduction predicated on eternal, unending, ceaseless vigilance.

Such a requirement is strict indeed.  We thus cannot do as the comments identified by petitioners did and overlook Congress's decision to emphasize that a conservation easement's purpose be protected in perpetuity.  Instead, we agree with the Tax Court.  Treasury's lack of a response to these comments does not jeopardize the validity of Treas. Reg. § 1.170A-14(g)(6)(ii).

**C.  *Chevron* Deference**

The petitioners also challenge Treas. Reg. § 1.170A-14(g)(6)(ii) as violating *Chevron USA Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984).  As background, the proceeds regulation implements I.R.C. § 170(h)(5)(A), which provides:  "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity."  Because the regulation does not allow donors to be compensated for post-donation improvements, the petitioners maintain that the proceeds regulation is not a permissible construction of I.R.C. § 170(h).  We are unpersuaded.

"In *Chevron*, the Supreme Court observed that, pursuant to the principle of deference to administrative interpretations, 'considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.'"  *Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 776 (6th Cir. 2008) (quoting *Chevron*, 467 U.S. at 844).  To determine whether deference to Treasury's statutory interpretation is warranted, we employ the familiar, two-step *Chevron* analysis.  *See Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 53–58 (2011).  "The initial question under step one of the *Chevron* framework is 'whether Congress has directly spoken to the precise question at issue' by employing precise, unambiguous statutory language."  *Alliance for Cmty. Media*, 529 F.3d at 776–77 (quoting *Chevron*, 467 U.S. at 842).  It is undisputed that I.R.C. § 170(h)(5)(A), the provision requiring that the conservation purpose of a donation be "protected in perpetuity," does not speak to the precise question at issue:  how judicial extinguishment affects the perpetuity requirement.

Our analysis thus proceeds to the second step of *Chevron*, which asks whether Treasury's interpretation was "based on a permissible construction of the statute."  *Tennessee Hosp. Ass'n*, 908 F.3d at 1037–38 (quoting *Chevron*, 467 U.S. at 843).  "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the

agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). "Whether an agency's construction is reasonable depends, in part, 'on the construction's "fit" with the statutory language, as well as its conformity to statutory purposes.'" *Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 262 (D.C. Cir. 2018) (quoting *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006)).

At its core, the petitioners' position centers on the fact that "[n]othing in § 170(h) suggests that a qualified organization must be compensated above the value of its qualified real property interest in the event the easement is extinguished." Pet'r Br. at 55. This statement is true, but incomplete: nothing in that section suggests that donors must be compensated for their post-donation improvements upon extinguishment either. Instead, the section is silent on what should happen if an easement is extinguished by judicial proceedings, including about what should happen with the value added by any post-donation improvements made by a donor.

Although it does not answer this exact question, the text of I.R.C. § 170(h)(5)(A) still provides direction. Section 170(h)(5)(A) requires that easements' conservation purposes be protected in perpetuity after the donation. This leaves donees responsible for stewarding the interest through eternity, a task that consumes not only time but resources, too.[8] A rule that, in the event of extinguishment, allowed donors to retain the value of post-donation improvements such as the petitioners propose would "likely enrich property owners at the public's expense, and leave donees with fewer proceeds with which to advance similar conservation purposes elsewhere." McLaughlin, *supra* at 139. Erring on the side of providing the donee with higher rather than lower proceeds, moreover, buoys the donee's ability to ensure that the conservation purpose of the easement continues upon extinguishment. With additional funds at its disposal, the conservation organization will likely have more options available to further the original conservation purpose in line with § 170(h)(5)(A). *See id.* at 136. Treasury Regulation § 1.170A-14(g)(6)(ii) does just that and is thus a reasonable interpretation of the section.

---

[8]As also noted *supra*, the legislative history that Treasury cited in its notice of proposed rulemaking confirms that Congress was concerned about donees having sufficient resources to ensure that an easement's conservation purpose be protected in perpetuity. *See* H.R. REP. NO. 96-1278, at 19; S. REP. NO. 96-1007, at 14.

Bolstering the reasonableness of the proceeds regulation is the fact that Congress has amended I.R.C. § 170 over thirty times during the past thirty-four years but has not voided Treas. Reg. § 1.170A-14(g)(6)(ii). *See Oakbrook Land Holdings*, 154 T.C. at 199–200, 199 n.5 (cataloguing amendments to § 170). "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 561 (1991) (quoting *United States v. Correll*, 389 U.S. 299, 305–06 (1967)). Over three decades of congressional acquiescence to the proceeds regulation leaves us confident that the regulation is owed our deference under *Chevron*.

Against this conclusion, the petitioners point to the other provision of I.R.C. § 170(h) that contains a perpetuity requirement, § 170(h)(2)(C). This subsection provides the definition of "qualified real property interest," which is "a restriction (granted in perpetuity) on the use which may be made of the real property." I.R.C. § 170(h)(2)(C). According to the petitioners, a donee has no interest in donor improvements under this subsection, and therefore it is unreasonable to give a donee the proceeds after judicial extinguishment that result from a donor's post-donation improvements.

Whatever else I.R.C. § 170(h)(2)(C) requires, the petitioners have not established that it requires donors to receive the value of their post-donation improvements. The subsection's text does not dictate this outcome, for all that it provides is that a qualified real property interest both be a restriction on the use of real property, and that the restriction be "granted in perpetuity." *Id.* Subsection 170(h)(2)(C) simply does not encompass post-donation improvements or suggest to whom their value should accrue upon judicial extinguishment. That gap was left for Treasury to fill, as it reasonably did with the proceeds regulation.

## D. Arbitrary or Capricious Review

Coupled with their *Chevron* argument, the petitioners argue that Treasury acted arbitrarily or capriciously in promulgating Treas. Reg. § 1.170A-14(g)(6)(ii) for two distinct

reasons:   because Treasury provided no explanation for why it adopted the rule, and because Treasury failed to consider a variety of alternatives.[9]  Neither argument is convincing.

When determining whether a final agency action is arbitrary or capricious, the scope of our review is "an extremely narrow one."  *Navistar Int'l Transp. Corp.*, 941 F.2d at 1352.  A court may not "substitute its judgment for that of the agency."  *Greenbaum v. U.S. EPA*, 370 F.3d 527, 542 (6th Cir. 2004) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).  Instead, we consider whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Ne. Ohio Reg'l Sewer Dist. v. U.S. EPA*, 411 F.3d 726, 731 (6th Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983)).  "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned."  *Id.* (quoting *Alaska Dep't of Env't Conservation v. U.S. EPA*, 540 U.S. 461, 497 (2004)).

The petitioners' first argument for why Treas. Reg. § 1.170A-14(g)(6)(ii) is arbitrary or capricious duplicates their argument for why the rule's concise general statement of basis and purpose is deficient.  In essence, the petitioners argue that the proceeds regulation could not be the product of reasoned decision-making because Treasury provided no explanation for why the agency settled on that formula for calculating proceeds.  Yet given the context of the rulemaking and the statutory issue that the agency confronted, we reiterate that the concise statement of basis and purpose that accompanied the proceeds regulation adequately explained Treasury's rationale: to create an administrable mechanism for enforcing I.R.C. § 170(h)(5)(A)'s perpetuity requirement.

---

[9]The petitioners insist that their arbitrary-or-capricious arguments are part of the *Chevron* analysis. Because we have previously analyzed these issues separately, *see Atrium Med. Ctr. v. U.S. Dep't of HHS*, 766 F.3d 560, 567 (6th Cir. 2014), we do so here.

Insofar as the petitioners try to bolster their arbitrary-or-capricious argument by relying on *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943), this, too, fails. In *Chenery*, the Supreme Court limited the grounds on which an agency's action could be upheld to those on which the agency relied at the time. 318 U.S. at 88. Under this rule, an agency must defend its actions based on the reasons that animated the act at issue, not for reasons that it formulated during litigation. *State Farm*, 463 U.S. at 50. *Chenery* does not, however, narrow our inquiry into an agency's contemporaneous rationale solely to the concise general statement. *See State Farm*, 463 U.S. at 43. As the Supreme Court has held in the context of determining whether a particular statutory interpretation guided an agency's actions, courts may accept the explanation provided by an agency during litigation for its conduct when this is "the only plausible explanation" of the course taken in the rulemaking. *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992); *see also Nat'l Elec. Mfrs. Ass'n v. U.S. Dept. of Energy*, 654 F.3d 496, 513 (4th Cir. 2011).

Such is the case here. Contrary to what the petitioners maintain, the Commissioner's rationale for the proceeds regulation—namely, that it was promulgated to create an administrable rule which ensured that a donee would receive sufficient funds upon extinguishment to continue the conservation purpose—aligns with the obvious concern evinced by Treasury during the rulemaking process that I.R.C. § 170(h)(5)(A)'s perpetuity requirement be satisfied in the event of judicial extinguishment. This rationale both tethered the regulation to its statutory source and left us a clear thread to trace how Treasury navigated between these two points. Treasury's citations to the committee reports provided further guidance into its decision to craft a rule that stood to benefit donees over donors upon extinguishment, an aim which coincided with Congress's "major policy decisions" concerning which entity should be favored post-donation.[10] 48 Fed. Reg. at 22940.

Moving to the petitioners' second rationale, none of the alternatives to which they point required Treasury's consideration. Two sources of possible alternatives—the RESTATEMENT

---

[10]The concurrence would have us ignore the Supreme Court because of its reading of *National Railroad. Passenger Corp.* as a "dead letter in legal history." Concur. op. at 37. We must, however, decline to conclude that "more recent cases have, by implication, overruled an earlier precedent" of the Court. *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

(THIRD) OF PROPERTY § 7.11 (Am. Law. Inst. 2000) and the testimony of SLRC's Executive Director, James Wright, at the trial before Judge Holmes in 2016, *see* J.A. 405–08 (Wright Test. Tr. at 205–08); Pet'r Br. at 51—did not exist when Treasury was promulgating the proceeds regulation in the 1980s. "[A] rulemaking 'cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man . . . regardless of how uncommon or unknown that alternative may have been"—or, in this case, regardless of how distant in the future that alternative was from existing. *State Farm*, 463 U.S. at 51 (quoting *Vermont Yankee*, 435 U.S. at 551); *see also Simms*, 45 F.3d at 1006.

The petitioners also flag a Maryland statute that governed condemnation awards and which the Maryland Agricultural Land Preservation Foundation attached to its comment. *See* J.A. at 742 (Md. Agric. Land Pres. Found. Cmt. attach.). According to the petitioners, this statute provided an alternative approach to how Treas. Reg. § 1.170A-14(g)(6)(ii) allocates proceeds. If it did, however, the Maryland Agricultural Land Preservation Foundation apparently did not think so. The organization's comment neither drew attention to this statute, nor put it forward as an alternative to the proceeds regulation. Instead, the Maryland Agricultural Land Preservation Foundation lumped this statute in with a series of laws from which the organization derived its legislative mandate. *Id*. at 725 (Md. Agric. Land Pres. Found. Cmt. at 1). Because even the organization that cited the statute did not consider it to be an alternative to the proceeds regulation, Treasury did not have to assess whether it was one.

Finally, the petitioners' heavy reliance on *State Farm* and *Judulang v. Holder*, 565 U.S. 42 (2011), to support their arbitrary-or-capricious arguments is misplaced. In *State Farm*, the alternative that the agency failed to consider—airbags—was well-known at the time, including to the agency itself. *See* 463 U.S. at 48. In *Judulang*, the agency had applied diverse statutory factors in an arbitrary manner. *See* 565 U.S. at 58–59. The petitioners have not pointed to an alternative to the proceeds regulation that was both well established and that Treasury ignored. Additionally, the regulation is a reasonable way to ensure that the perpetuity requirement of I.R.C. § 170(h)(5)(A) is protected in the event of a judicial extinguishment of a conservation easement. Therefore, Treasury acted neither arbitrarily nor capriciously in promulgating Treas. Reg. § 1.170A-14(g)(6)(ii).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the Tax Court upholding the procedural and substantive validity of Treas. Reg. § 1.170A-14(g)(6)(ii).

---

## CONCURRING IN THE JUDGMENT

---

RALPH B. GUY, JR., Circuit Judge, concurring in the judgment only. The Department of the Treasury must play by the same rules as other federal agencies. The Supreme Court made that clear when it refused to "carve out an approach to administrative review good for tax law only" and "expressly 'recognized the importance of maintaining a uniform approach to judicial review of administrative action.'" *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 55 (2011) (cleaned up) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)). But it seems the majority opinion has done the opposite for Treasury's proceeds regulation (Treas. Reg. § 1.170A-14(g)(6)(ii)). In my view, the regulation is procedurally invalid under the Administrative Procedure Act (APA) for substantially the same reasons stated by the Eleventh Circuit in *Hewitt v. Commissioner of IRS*, 21 F.4th 1336 (11th Cir. 2021), and by the concurring and dissenting opinions in *Oakbrook Land Holdings, LLC v. Commissioner of IRS*, 154 T.C. 180, 200-30 (2020) (Torro, J., concurring in the judgment, joined in full by Urda, J., and joined in part by Gustafson and Jones, JJ.); *id.* at 230-259 (Holmes, J., dissenting). But I would conclude that the Commissioner's statutory argument is not forfeited and affirm on that basis.

## I.

The proceeds regulation at issue is procedurally invalid under 5 U.S.C. §§ 553(c), and 706(2)(A), of the APA. *Hewitt*, 21 F.4th at 1350-53; *Oakbrook*, 154 T.C. at 216-30 (Torro, J., concurring in the judgment); *id.* at 230-53 (Holmes, J., dissenting).[1]

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Further, "[a]n agency must consider and respond to *significant comments* received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (emphasis added) (collecting cases). Treasury cannot get by without any explanation for the

---

[1]Insofar as it concerns the validity of the proceeds regulation, this case is materially identical to *Hewitt* because, there, the tax court decided the case based upon its *Oakbrook* decision. *Hewitt*, 21 F.4th at 1339. But the Eleventh Circuit reversed—and rightly so. *Id.* at 1353.

regulation and without responding to the *significant* comment submitted by the New York Land Conservancy (NYLC).  *See* 51 Fed. Reg. 1496, 1496 (Jan. 14, 1986).  (*Contra* Maj. Op. 6, 10, 16).

As the Eleventh Circuit held, NYLC's comment "was significant and required a response by Treasury to satisfy the APA's procedural requirements."  *Hewitt*, 21 F.4th at 1351.  Because Treasury "failed to respond to NYLC's significant comment concerning the post-donation improvements issue as to proceeds, it violated the APA's procedural requirements."  *Id.* at 1353.

The majority opinion makes NYLC's four-page comment seem insignificant by condensing it to one sentence and omitting the most important part.  *Compare* (Maj. Op. 16), *with Hewitt*, 21 F.4th at 1345 (quoting extensively from NYLC's comment).  In part, NYLC's comment made the following points:

1. Most importantly, NYLC stated that the proceeds regulation "contemplates that a ratio of value of the conservation restriction to value of the fee will be fixed at the time of the donation and will remain in effect forever thereafter. *This formula fails to take into account that improvements may be made thereafter by the owner which should properly alter the ratio*."  J.A. 671 (emphasis added).  NYLC drove the point home with a specific example. Suppose the owner of property worth $100,000 grants a "scenic easement" worth 10% of the value of the entire parcel, guaranteeing that the owner of Parkacre and his successors will never build high-rise buildings in order to ensure Parkacre is a place to enjoy nature and sunlight.  *See* J.A. 670-71; *see also* 48 Fed. Reg. 22940, 22944-55 (May 23, 1983).  The parcel owner then spends $2 million to build rental housing units on the parcel.  *Id.*  If the easement is later extinguished in eminent domain proceedings for the parcel, "the donee organization would be entitled . . . to 10% of the sale price of the entire parcel including the improvements," i.e., 10% of $2.1 million.  J.A. 671.  "*This would obviously be undesirable to the prospective donor and would constitute a windfall to the donee organization*."  *Id.* (emphasis added).

2. NYLC thus contended that the proceeds regulation "contain[s] *problems of policy and practical application* so pervasive as to cause [NYLC] to recommend strongly the deletion of these provisions. *The statute was enacted by Congress to encourage the protection of our significant natural and built environment through the donation of conservation restrictions and yet, the proposed provisions would thwart the purpose of the statute by deterring prospective donors*."  J.A. 670 (emphasis added).

3.  NYLC spoke from first-hand experience, recounting that "it is our experience that prospective donors frequently raise the question that 'perpetuity' is a long time and may impose unforeseeably heavy burdens on themselves or future owners under unforeseeable future circumstances. We find ordinarily that these concerns are mollified upon the donor's recognition that common law permits extinguishment of restrictions . . . . Obviously, the prospect of extinguishment would no longer mollify these fears if a split of proceeds under unknown circumstances would be required." J.A. 670-71.

4.  NYLC—a donee organization—emphasized that "[t]he value of a conservation restriction to the donee organization is not a monetary value but a philanthropic value as a device for achieving the charitable objectives of the organization," such that "the extinguishment of a conservation restriction cannot be compensated by the payment of money." J.A. 671. To that end, NYLC stated that it "would prefer to eliminate" the proceeds regulation rather than "trade on the prospect of future windfalls when restrictions are extinguished." *Id*.

5.  "In light of the potential inequities described," NYLC concluded by "*recommend[ing] that the proposed proceeds formula be revised to prevent such inequities*," but "*strongly recommend[ed] deletion of the entire extinguishment provision*." J.A. 672 (emphasis added).

NYLC's comment was "significant": It "show[ed] why [a] mistake was of possible significance in the results." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973)). The comment is significant for two principal reasons.

*First*, NYLC's comment is significant because it showed that the regulation "would thwart" one of "the purpose[s] of the statute by deterring prospective donors." J.A. 670; *accord Hewitt*, 21 F.4th at 1351. That is, "[o]ne of the policy decisions reflected in th[e] 'committee reports,' expressly referenced by Treasury," *Hewitt*, 21 F.4th at 1351 (quoting 48 Fed. Reg. at 22940), "provided that 'the preservation of our country's natural resources and cultural heritage is important,' that 'conservation easements now play an important role in preservation efforts,' and that 'provisions allowing deductions for conservation easements should be directed at the preservation of unique or otherwise significant land areas or structures.'" *Id.* (quoting S. REP. NO. 96-1007, at 9 (1980)); *see also BC Ranch II, L.P. v. Comm'r of IRS*, 867 F.3d 547, 553-54 (5th Cir. 2017).

*Second*, NYLC cast doubt on the reasonableness of the regulation's formula and further showed that it would "obviously" deter donors because "the regulation's proceeds formula: (1) 'contemplates that a ratio of value of the conservation restriction to value of the fee will be fixed at the time of the donation and will remain in effect forever thereafter'; and (2) 'fail[ed] to take into account that improvements may be made thereafter by the owner which should properly alter the ratio.'" *Hewitt*, 21 F.4th at 1351 (quoting NYLC's comment); *see* J.A. 670-71. The majority opinion does not grapple with this second aspect of the reasoning in *Hewitt*. If it was a significant comment to suggest that an agency's uniform cook temperature for all fish should be altered to each species of fish so that the product is not destroyed, *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 243, 252-53 (2d Cir. 1977); (Maj. Op. 15-16), then NYLC's comment was likewise significant because it argued that a donor's post-donation improvements "should properly alter the ratio" so that Congress's tax incentive for prospective donors is not destroyed. J.A. 671.

Treasury might have explained that post-donation improvements might cause a slight *indirect* increase in the value of an easement and that the donee should reap the total value *of the easement*. But Treasury did not. More importantly, Treasury left everyone to wonder: Why would the easement holder be entitled to receive a proportional percentage of the *actual value of* the donor's post-donation improvements, i.e., rental housing units or a country club and golf course? Why would the statutory tax deduction incentivize any donor to grant a conservation easement if it means the donor (and any successors) must agree to give the donee the easement proceeds *and* a proportional ratio of *any* future improvements in the event of judicial extinguishment? Or why would Treasury require that the value of separate property rights (the easement and the property burdened) *always* maintain a proportional value relationship when "there is commonly little, if any, relation." RESTATEMENT (FIRST) OF PROPERTY § 508 cmt. b (Am. Law. Inst. 1944). This court should not "sanction silence in the face of such vital questions." *Nova Scotia Food Prods.*, 568 F.2d at 253.[2]

---

[2]The Restatement (Second) of Property did not address easements because the Restatement (First) of Property remained the prevailing rules for easements at the time Congress added the perpetuity requirements in I.R.C. § 170(h)(2)(C), and (h)(5)(A). *See* RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT intro. (Am. L. Inst. 1983), and RESTATEMENT (SECOND) OF PROPERTY: DONATIVE TRANSFERS intro. (Am. L. Inst. 1977).

The bottom line is there is no doubt that NYLC's comment "'can be thought to challenge [two] fundamental premise[s]' underlying the proposed agency decision" and Treasury failed to respond. *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)); *see Hewitt*, 21 F.4th at 1351-52. (*Contra* Maj. Op. 15-16 (stating the same test but a contrary conclusion). In other words, Treasury's decision is arbitrary and capricious because it "entirely failed to consider [these] important aspect[s] of the problem." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Two of the cases Oakbrook relies upon underscore the errors in this case. Both cases invalidated agency action because the agency's explanation was insufficient.

At issue in *Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012), was a Treasury regulation interpreting "the avoided-cost rule set out in the statute at I.R.C. § 263A(f)(2)(A)(ii)," "as applied to property temporarily withdrawn from service." 681 F.3d at 1317. *Dominion* explained that the notice of proposed rulemaking "provided no rationale other than the general statement that the regulations are intended to implement the avoided-cost method." *Id.* at 1319. Here, Treasury did not even do that much. And, as in this case, the agency in *Dominion* "provided no rationale in the final regulations." *Id.* The Federal Circuit reversed the trial court because it "erroneously stretched to conclude that 'the path that Treasury was taking in the rulemaking proceedings can be discerned, albeit somewhat murkily.'" *Id.*

Treasury gave us even less to work with than in *Dominion*. Here, the notice of proposed rulemaking simply stated that the regulations relate to "contributions not in trust of partial interests in property" under "section 6 of the Tax Treatment Extension Act of 1980" and that "[t]he regulations reflect the major policy decisions made by the Congress and expressed in these committee reports." 48 Fed. Reg. at 22940. The final regulations merely stated that the "regulations provide necessary guidance to the public for compliance with the law and affect

---

The law of easements was not revisited until 2000, but even then the changes were intended to "simplif[y] and clarif[y]" this area of the law and were largely a matter of "form rather than of substance." *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES intro. (Am. L. Inst. 2000).

donors and donees of qualified conservation contributions." 51 Fed. Reg. at 1496. From these statements and the use of "protected in perpetuity" in Treas. Reg. § 1.17A-14(g)(6)(i), the majority opinion stretches to conclude that Treasury "tethered the regulation to its statutory source and left us a clear thread to trace how Treasury navigated between these two points." (Maj. Op. 25).

We may be able to discern that Treasury was interpreting Congress's perpetuity requirement, but the thread stops there. As in *Dominion*, the proceeds regulation is invalid because Treasury provided "no explanation for the way that use of [a fixed ratio at the time of the grant] implements the [protected-in-perpetuity] rule." 681 F.3d at 1319. Treasury compounded its error by failing to address NYLC's significant comment that post-donation improvements should "properly alter the ratio," rather than be divvied up according to a ratio fixed at the time of the grant.[3]

The reasoning in *Carlson v. Postal Regulatory Commission*, 938 F.3d 337 (D.C. Cir. 2019), explains why NYLC's comment required a response. *Carlson* considered an agency's decision to increase the cost of letter stamps by five cents. 938 F.3d at 341. The Postal Service's proposal noted that "keeping the price of stamps 'at round numbers divisible by five'" would help achieve one of the statutory goals, "simplicity of structure." *Id.* at 342. Carlson, a "postal customer and watchdog," chimed in during notice-and-comment, arguing: (1) that "keeping the price of a stamp divisible by five did not promote the value of 'simplicity of structure'"; (2); that "raising the price of stamps by five cents was inconsistent with the statutory objective of 'establish[ing] and maintain[ing] a just and reasonable schedule for rates'" (similar to NYLC's argument that the fixed-ratio formula is flawed and would "thwart" the statutory goal of encouraging conservation easements); and (3) that "the detrimental 'effect of rate increases upon the general public' weighed against the Postal Service's proposal" (analogous to NYLC's

---

[3]The majority opinion cites three rare cases from other circuits for the proposition that a statement of basis and purpose is not necessary "where the basis and purpose [are] considered obvious." (Maj. Op. 11 (quoting *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 443 (9th Cir. 1993)). But the basis for Treasury's fixed-ratio formula is far from obvious. This is not a case where the agency used a "mechanical application of the statutory formula" to merely set a rate per pound of almonds to fund its operations, as required. *See Cal-Almond*, 14 F.3d at 433, 439, 443. Here, Treasury *created a formula* for the division of proceeds from the sale of discrete property interests based upon the word "perpetuity," I.R.C. § 170(h)(2)(C), and (h)(5)(A), or at least that is what we can gather from the proceeds regulation itself because Treasury did not provide an explanation.

statement that "problems of policy and practical application" and "inequities" weighed in favor of revising the regulation or deleting it altogether). *Id.* at 342, 345-47 (alterations in original). The agency did not respond to Carlson's comments, but it did more than Treasury here; it at least "referenced, but did not resolve, Carlson's" first point. *Id.* at 342. The court held that all of Carlson's comments were significant and "warranted [a] response" because they concerned "several relevant statutory objectives and factors." *Id.* at 345. "By failing to consider relevant statutory objectives and factors and declining to respond to significant public comments, the Commission violated the APA when it approved the stamp price hike." *Id.* at 351. The same is true here.

The majority opinion acknowledges that "encouraging the donation of conservation easements is undeniably a goal of the statute." (Maj. Op. 19). Yet it treats one other statutory goal—perpetuity—as a trump card, such that Treasury was free to ignore any comment unless the comment showed that the regulation "fail[ed] to satisfy" the "perpetuity requirement." (Maj. Op. 18; *see id.* 16-21, 23-24).

On the contrary, "[e]ven when an agency has significant discretion in deciding how much weight to accord each statutory factor, that does not mean it is free to ignore any individual factor entirely." *Carlson*, 938 F.3d at 344 (cleaned up) (quoting *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998)); *see also Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983) (holding that the agency "must explain why a particular proposal is inconsistent with the balance between regulation and competition" (citation omitted)); *Nova Scotia Food Prods.*, 568 F.2d at 253 ("[T]he administrative process should disclose, at least, whether the proposed regulation is considered to be commercially feasible, or whether other considerations prevail even if commercial infeasibility is acknowledged."). As in *Carlson*, Treasury "also failed to evaluate how other statutory objectives and factors," such as encouraging the donation of conservation easements, "might bear on the proposed [proceeds regulation] or outweigh [Treasury's *purported*] reliance on" the perpetuity requirement. *Id.* at 347.

Treasury was required to *explain to the public*, why post-donation improvements are not taken into account and why it balanced the competing statutory interests in favor of adopting a fixed-ratio formula. "[A]n agency may justify its policy choice by explaining why [its] policy 'is more consistent with statutory language' than alternative policies," but Treasury is not permitted to remain silent and leave it for a court to "supply a reasoned basis for the agency's decision." *Encino Motorcars*, 579 U.S. at 223 (citation omitted). (*Contra* Maj. Op. 13, 19-20, 22, 25).

Against this backdrop, NYLC's comment required a response because it was based on first-hand experience, and common sense for that matter; it challenged the logic of the fixed-ratio formula that Treasury created; and it raised relevant statutory objectives. After all, if individuals "must turn square corners when they deal with the Government," it is only fair that "the Government should turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (citations omitted). Because Treasury failed to respond to NYLC's comment, the proceeds regulation is procedurally invalid.

The majority opinion concedes that "if an agency could ignore every comment regardless of its content, then the process of soliciting public input would be pointless." (Maj. Op. 14 (citing *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012)). But in the end, the majority has rendered that process meaningless because Treasury provided no explanation for its decision and Treasury ignored NYLC's *significant* comment and every other comment about the proceeds regulation.

## II.

Treasury's decision to remain silent has consequences: We cannot rely on *post hoc* explanations; nor can a court offer the reasons that might have supported Treasury's decision. The majority explains why the proceeds regulation is needed to implement the statute's protected-in-perpetuity requirement and why, as a matter of policy, the division of extinguishment proceeds should be "more favorable to donees than to donors," such that the easement holder should receive a fixed ratio of the actual value of the *donor's* post-donation improvements. (Maj. Op. 13, 19-20, 22, 25). The problem is that Treasury did not provide these reasons at the time it promulgated the proceeds regulation.

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec.*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). "It is not the role of the courts to speculate on reasons that might have supported an agency's decision. '[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Encino Motorcars*, 579 U.S. at 224 (quoting *State Farm*, 463 U.S. at 43). That also means "courts may not accept . . . counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50. This "rule serves important values": It promotes "agency accountability"; instills "confidence that the reasons given are not simply 'convenient litigating position[s]'"; and preserves "the orderly functioning of the process of review." *Dep't of Homeland Sec.*, 140 S. Ct. at 1909 (citations omitted).

The Commissioner's brief and the majority opinion offer a similar rationale and cite the same law review article published in 2021. (Appellee Br. 61-63; Maj. Op. 13, 22). But "[t]he functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves." *Dep't of Homeland Sec.*, 140 S. Ct. at 1909.

Yet the claim is made that: "[T]he Supreme Court has held in the context of determining whether a particular statutory interpretation guided an agency's actions, courts may accept the explanation provided by an agency during litigation for its conduct when this is 'the only plausible explanation' of the course taken in the rulemaking." (Maj. Op. 25 (quoting *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992)).

But *Boston & Maine Corp.* is not relevant. There, the Court addressed an agency's "interpretation of the word 'required,'" which the agency "did not in so many words articulate" in the context of an *adjudication*—not notice-and-comment rulemaking. *See id.* at 409-10; *United States v. Mead Corp.*, 533 U.S. 218, 230 n.12 (2001). Moreover, the Court deferred to the agency's "position before the Court" because "the only plausible explanation" of the agency's opinion was that the agency's adjudicative "decision was based on the [same] proffered interpretation." 503 U.S. at 418, 420. That is a world apart from the situation here: a proceeds regulation interpreting the statutory requirements that a deed must grant an easement

"in perpetuity" for a "conservation purpose [that] is protected in perpetuity."    I.R.C. § 170(h)(2)(C), (h)(5)(A).   It is one thing to say that it is obvious Treasury's regulation is interpreting the protected-in-perpetuity requirement.   But it is a stretch to say that there is *only one* plausible rationale (if any) for a regulation that divides proceeds according to a fixed ratio set at the time of the easement grant.   Otherwise, *Boston & Maine* would swallow the rule that we may consider "only contemporaneous explanations for agency action."   *Dep't of Homeland Sec.*, 140 S. Ct. at 1908.

The Supreme Court has never again so much as mentioned the statement the majority relies on from *Boston & Maine*.   Instead, the Court has since repeatedly said the opposite, and that shows *Boston & Maine* is a dead letter in legal history.   *See* 503 U.S. at 425-28 (White, J., joined by Blackmun and Thomas, JJ., dissenting) (arguing *State Farm* controls and "the majority is simply wrong" to defer to "the *post hoc* rationalization of Government lawyers"); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).   There is no reason to resurrect the statement in *Boston & Maine*.

### III.

The proceeds regulation also does not survive *Chevron.*   Where, as here, the rulemaking process was "procedurally defective," a regulation does not receive *Chevron* deference. *Household Credit Servs. v. Pfennig*, 541 U.S. 232, 242 (2004) (quoting *Mead*, 533 U.S. at 227); *accord Mayo Found.*, 562 U.S. at 53; *see, e.g.*, *Encino Motorcars*, 579 U.S. at 220-21, 224.[4]

### IV.

But this does not mean Oakbrook should prevail outright.   Because Oakbrook's deed calls for the donee to receive a *fixed amount* in the event of a judicial extinguishment, the deed violates the plain language of Congress's requirement that the conservation easement must be granted in perpetuity under I.R.C. § 170(h)(2)(C).   (Appellee Br. 32-35, 37); *see Oakbrook*, 154 T.C. at 204-07 (Toro, J., concurring in the judgment, joined by Gustafson, Urda, and Jones, JJ.).

---

[4]The Eleventh Circuit decided not to reach the claimants' *Chevron* arguments because it concluded that Treas. Reg. § 1.170A-14(g)(6)(ii) is procedurally invalid under the APA.  *Hewitt*, 21 F.4th at 1339 n.1.

Congress did not require much as it relates to "perpetuity." The easement deed need only impose "a restriction (granted in perpetuity) on the use which may be made of the real property," I.R.C. § 170(h)(2)(C), and ensure that "the conservation purpose" (the restriction) is "protected in perpetuity," § 170(h)(5)(A); *see also* Pub. L. No. 96-541, § 6, 94 Stat. 3204, 3206-07 (1980). At the time of enactment in 1980, dictionaries defined "perpetuity" as "forever." *Hoffman Props. II, LP v. Comm'r of IRS*, 956 F.3d 832, 834 (6th Cir. 2020) (citations omitted).

"Property is often described as a bundle of rights or sticks," meaning "that ownership of property involves certain 'sticks' (or 'strands') of legal rights"—e.g., the right to possess, the right to use and develop, the right to exclude, the right to convey, and the right to profit from property—and thus "the aggregate of all of the sticks constitutes the full 'bundle' of rights." *See* 2A JULIUS L. SACKMAN ET AL., NICHOLS ON EMINENT DOMAIN § 6.01(8) (Matthew Bender 3d ed. 2021), and accompanying footnotes; *see also Andrus v. Allard*, 444 U.S. 51, 65-67 (1979); *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). An easement is "[a]n interest in land owned by another person" that "may last forever, but it does not give the holder the right to possess, take from, improve, or sell the land." *Easement*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also* RESTATEMENT (FIRST) OF PROPERTY §§ 450, 452 (Am. L. Inst. 1944). By 1965, it was well understood that a "conservation easement" "permanently restricts or imposes affirmative obligations on the property's owner or lessee to retain or protect natural, scenic, or open-space values of real property, . . . while allowing the landowner to continue to own and use the land, sell it, or transfer it to heirs." *Easement* (*conservation easement*), BLACK'S LAW DICTIONARY, *supra*.

With that understanding, the statute only requires a donor to give a qualified organization one right from the bundle—the right to forever prevent uses of the property in a way inconsistent with the qualified conservation purpose. *See, e.g., Hoffman Props.*, 956 F.3d at 835; *Pine Mt. Pres. v. Comm'r of IRS*, 978 F.3d 1200, 1206 (11th Cir. 2020); *BC Ranch II*, 867 F.3d at 551-54. Oakbrook's deed does that. *See* J.A. 112-19. Oakbrook holds all the remaining rights.

From there, the statute requires that the easement be "granted in perpetuity," I.R.C. § 170(h)(2)(C), meaning the donee must "*hold* [that] property interest in perpetuity[.]" *Glass v. Comm'r of IRS*, 471 F.3d 698, 713 (6th Cir. 2006) (cleaned up; emphasis added). When that

provision was enacted, the blackletter law of property dictated that "[u]pon the extinguishment of an easement by eminent domain, the owner of the easement is entitled to compensation *measured by the value of the easement*." RESTATEMENT (FIRST) OF PROPERTY § 508 (emphasis added); *see also id.* § 508 cmt. b ("Fair value for purposes of the award is the loss to the owner of the easement[.]"); *id.* § 566 cmt. b. Indeed, the Supreme Court "repeatedly held that just compensation normally is to be measured by 'the market value of the property *at the time of the taking* contemporaneously paid in money.'" *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984) (emphasis added) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)); *accord Horne v. Dep't of Agric.*, 576 U.S. 351, 368-69 (2015).[5] Today, Tennessee follows the same rules.[6]

Oakbrook's deed, however, limits the donee's proceeds to a fixed amount determined *at the time of the grant*. J.A. 121-22. Oakbrook admits that "'perpetuity'—as used in connection with conservation easements—draws on the term's common-law meaning and denotes only that the granted property won't automatically revert to the grantor, his heirs, or assigns." *Pine Mt. Pres.*, 978 F.3d at 1209; (Reply Br. 6). But Oakbrook's deed does not treat the donee as the holder of the easement right at the time of judicial extinguishment because the donee's easement rights are not appraised at the time of judicial extinguishment. Rather, the announcement of a judicial extinguishment effectively means the easement right reverts to Oakbrook because the donee receives a fixed amount set at the time of the grant. Accordingly, Oakbrook did not gift an easement interest "granted in perpetuity." *See* I.R.C. § 170(h)(2)(C).

In that regard, Oakbrook's deed makes this case different from *Hewitt*. There, the deed provided that, upon judicial extinguishment, the donee will receive "a fair market value determined by": (1) finding the current "fair market value of the Property unencumbered by the

---

[5]The Restatement (First) of Property articulates the prevailing rules for easements at the time Congress added the perpetuity requirements in I.R.C. § 170(h)(2)(C), and (h)(5)(A). *See supra* n.2.

[6]"The appraisal shall value the property considering its highest and best use, its use *at the time of the taking*, and any other uses to which the property is legally adaptable *at the time of the taking*." Tenn. Code Ann. § 29-17-1004 (emphasis added); *see also id.* § 29-17-902 (providing that the condemning governmental authority "shall proceed to determine what it deems to be the amount of damages to which the owner is entitled because of the taking of such property or property rights"); *id.* § 29-17-910 ("*In all instances the amount to which an owner is entitled* shall be determined by ascertaining the fair cash market *value of the property or property rights taken*.") (emphasis added).

Easement (*minus any increase in value after the date of th[e] grant attributable to improvements*)"; and (2) multiplying that amount "by the ratio of the value of the Easement at the time of this grant to the value of the Property." *Hewitt*, 21 F.4th at 1340 (emphasis in original). While Oakbrook's deed similarly subtracts post-donation improvements, it differs because it fixes the fair market value "as of the date of th[e] Conservation Easement" grant. J.A. 121.

The only problem is that, although the Commissioner presses this statutory argument now, the Commissioner did not raise the argument before the tax court. It appears four of the tax court judges decided to raise the argument *sua sponte*. *See Oakbrook*, 154 T.C. at 204-07 (Toro, J., concurring in the judgment, joined by Gustafson, Urda, and Jones, JJ.). The only statutory argument the Commissioner raised was that Oakbrook's easement deed "violates I.R.C. § 170(h)(2)(C) and (h)(5)(A) because the area covered by the conservation easement is not clearly defined." J.A. 34, 39-40, 47-49. The same provisions are the basis of the Commissioner's current statutory argument.

"[W]e customarily require the party to raise the issue in the [trial] court" before we will consider the issue on appeal. *Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. L. Off. of Michael A. DeMayo, LLP*, 21 F.4th 350, 355 (6th Cir. 2021) (explaining the reasons for the rule). "An exception can be made, however, for 'exceptional cases' or if failing to consider the argument would result in a 'plain miscarriage of justice.'" *United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006) (Gibbons, J.) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)); *see also Sheet Metal*, 21 F.4th at 357.

As in *Ellison*, this is "an exceptional case." 462 F.3d at 560. The question here is "purely a legal one"—whether a deed provides that extinguishment proceeds are measured by the value of property rights at the time of extinguishment in order to satisfy the statutory requirement that a conservation easement must be "granted in perpetuity." *Id.* The parties also have fully briefed the issue, so it is "'presented with sufficient clarity and completeness' to ensure a proper resolution." *Id.* at 560-61 (quoting *Pinney Dock*, 838 F.2d at 1461). "It requires no further development of the record at the [trial] court level, and thus, [Oakbrook] will not be

prejudiced by the inability to present evidence to that court." *Id.* at 561 (reversing district court based on new argument).

In terms of fairness to the tax court, *see Sheet Metal*, 21 F.4th at 356, there is a significant difference between considering an argument to reverse a trial court and considering an argument to affirm. After all, we "may affirm a decision of the district court for any reason supported by the record, including on grounds different from those on which the district court relied." *Thomas v. City of Columbus*, 854 F.3d 361, 364-65 (6th Cir. 2017) (citation omitted); *accord U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003).

Setting aside any exception to the forfeiture rule, our court and the Supreme Court "recognize a distinction between failing to properly raise a claim before the district court and failing to make an argument in support of that claim." *United States v. Reed*, 993 F.3d 441, 453 (6th Cir. 2021) (citation omitted); *see also Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010) (concluding that the argument that a case "should be overruled is 'not a new claim,'" but instead, "it is—at most—'a new argument to support what has been a consistent claim: that the FEC did not accord Citizens United the rights it was obliged to provide by the First Amendment" (cleaned up)). The Commissioners' "arguments" that Oakbrook's deed violates § 170(h)(2)(C) and (h)(5)(A) "in two different ways, by [failing to sufficiently define the conservation area] and by [failing to satisfy the perpetuity requirements], are not separate *claims*. They are, rather, separate *arguments* in support of a single claim—that the [deed] effects [a violation of the statute]." *Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992). "Having raised a [statutory violation] claim in the [tax] courts, therefore, [Oakbrook] could have formulated any argument [it] liked in support of that claim here." *Id.* at 535.

Accordingly, I would address the Commissioner's statutory argument.

\*     \*     \*

I would conclude that the proceeds regulation is invalid. But I would still affirm on the basis that Oakbrook's deed violates the perpetuity requirement under I.R.C. § 170(h)(2)(C).